## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>   **Plaintiff,**<br><br>   v.<br><br>**YOUR YELLOW BOOK INC, a corporation, also d/b/a/ YOUR YELLOW BOOK,**<br><br>**BRANDIE MICHELLE LAW, individually and as an officer or director of YOUR YELLOW BOOK INC,**<br><br>**DUSTIN R. LAW, individually and as an officer or director of YOUR YELLOW BOOK INC,**<br><br>**ROBERT RAY LAW, individually and as an officer or director of YOUR YELLOW BOOK INC and CPU SERVICE INCORPORATED, and**<br><br>**CPU SERVICE INCORPORATED, a corporation,**<br><br>   **Defendants.** | **Civil Action No. CIV-14-786**<br>**Judge Timothy D. DeGiusti**<br><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN ORDER TO SHOW CAUSE WHY CONTEMPT DEFENDANTS ROBERT RAY LAW AND CPU SERVICE INCORPORATED SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING THE STIPULATED ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT** |

Plaintiff Federal Trade Commission ("FTC") moves the Court for a Show Cause Hearing to require original defendant Robert Ray Law and his new enterprise CPU Service Incorporated ("CPU") (collectively, "Contempt Defendants") to demonstrate why they should not be held in civil contempt for violating the Stipulated Order for Permanent Injunction and Monetary Judgment [Doc. No. 71] ("Final Order") in this case.

## I.    INTRODUCTION

Ignoring this Court's Final Order barring him from misrepresenting that consumers owe money for a good or service and from using consumer information obtained in

1

connection with Your Yellow Book Inc ("YYB"), Contempt Defendant Law is once again blast-faxing deceptive invoice-like documents to the same small businesses that were the target of his first scam. And once again hundreds of organizations, including churches, schools, hospitals, doctor's offices, and restaurants are being deceived.

As discussed below, Law's brazen plan to continue his deceptive invoicing scheme began before this Court entered the Final Order. In the current scam, instead of a worthless Internet business directory, Contempt Defendants are billing for worthless online computer support and consulting. Their treachery has resulted in hundreds of thousands of dollars of injury to hundreds of organizations that paid for unordered, unwanted, undelivered (and likely nonexistent) services. Accordingly, the FTC seeks civil contempt sanctions, including both compensatory relief for consumers harmed by the contemptuous acts and coercive relief to compel restitution and compliance with the Final Order.[1]

## II.    STATEMENT OF THE FACTS

### A .    Prior Action against Your Yellow Book Defendants

In its July 24, 2014 complaint [Doc. No. 1], which led to entry of the Final Order, the FTC charged that YYB, Robert Ray Law, Dustin R. Law, and Brandie Michelle Law, violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, by making false and misleading claims in connection with their sale of Internet business-directory listings, including misrepresenting that consumers owe money for a good or service.

---

[1]  Pursuant to Federal Rule of Civil Procedure 60(b), the FTC is concurrently filing a motion to modify the Final Order to ban Contempt Defendants from using unsolicited direct mail to advertise, market, sell, or bill for any goods or services.

This Court found that the FTC was likely to succeed on the merits, balanced the equities, and entered an *ex parte* temporary restraining order [Doc. No. 10] ("TRO") against YYB defendants containing an asset freeze, financial accounting, and expedited discovery provisions. Contempt Defendant Law and his son, Dustin Law, immediately violated the TRO by dissipating more than $7,000, failing to adequately complete court-ordered financial disclosure forms, and attempting to delete electronically-stored business records, thus causing FTC to file a motion for contempt [Doc. No. 35]. Following a contested hearing, the Court entered an Order of Contempt [Doc. No. 54] against Law and his son for multiple violations of the TRO and found their conduct "evince[d] a pattern and practice of disregarding obligations imposed upon them by court order both in the present litigation and in previous litigation."[2]

On August 21, 2014, following an evidentiary hearing, the Court entered a preliminary injunction order [Doc. No. 50] ("Preliminary Injunction") continuing the provisions of the TRO, including an injunction against misrepresenting that consumers owe money for a good or service.[3] As discussed below, Law soon thereafter created CPU and began faxing deceptive invoice-like documents to businesses across the country in violation of the Preliminary Injunction.

---

[2] Doc. No. 54, Findings and Order of Contempt, at 12. The Court further stated that defendants "previously disregarded obligations imposed upon them pursuant to cease and desist orders entered by the United States Postal Inspection Service." *Id.*

[3] Doc. No. 50, Findings of Fact, Conclusions of Law and Order, at 14, Section I.C. Prohibited Business Practices.

On September 24, 2014, Law and the other YYB defendants signed a stipulated order to settle the case, and, following review and approval by the FTC, the Court entered the Final Order on December 2, 2014.[4]

### B.      Parties to the Current Action: Contempt Defendants

According to incorporation papers produced by Contempt Defendants, Law is the Registered Agent, Incorporator, and sole Director of CPU.[5] Law is also President and owner of CPU, and claims to be solely responsible for all activities of the corporation.[6]

CPU Service Incorporated, an Oklahoma corporation formed on November 4, 2014, uses a P.O. Box at 9201 South Penn, # 892363, Oklahoma City, Oklahoma 73159 as its principal address.[7] CPU purports to provide online computer support and consulting.[8] At least until June 8, 2015, the CPU website, found at cpuserviceinc.com, merely summarized

---

[4]   On December 9, 2014, Contempt Defendant Law acknowledged receipt of the Final Order. Ex. 1, Order Acknowledgement. The Exhibits to this motion are identified by Exhibit Number and brief title, followed by page, paragraph, and Attachment numbers, if applicable.

[5]   Ex. 2, Secretary of State Records. This document was produced to the FTC by Contempt Defendant Law. After receiving complaints about a new suspicious company, the FTC exercised its rights under the Final Order's Compliance Monitoring provisions sending a series of four requests for documents and information relating to CPU. Law produced incorporation papers, documents faxed to businesses, a database of businesses to which faxes were sent, a list of businesses that paid CPU, bank records, and other documents.

[6]   Ex. 3, Response to FTC's First Request. The FTC suspects, but has insufficient evidence to prove, that Dustin Law is participating in contemptuous conduct with his father.

[7]   Ex. 2, Secretary of State Records.

[8]   Ex. 4, Decl. of FTC Investigator Brent D. McPeek Re: Contempt ("McPeek Decl.") at 2-3, ¶ 9, Att. 5, CPU invoice-like fax.

4

services that purportedly were "Coming Soon." Sometime thereafter, the website became password protected, shielding portions of it from view.[9]

### C.    Violations of the Court's Final Order

The Final Order *inter alia* contains prohibitions against misrepresentations in the sale of any good or service and against using or benefitting from consumer information obtained in connection with YYB. Contempt Defendants violated both of these provisions.

### 1.    Misrepresentations in Violation of the Final Order

Section II.C. of the Final Order permanently restrains and enjoins all those bound by the order from "misrepresenting, or assisting others in misrepresenting, expressly or by implication . . . that consumers owe money for a good or service."[10]

Beginning in October 2014 and continuing unabated after entry of the Final Order on December 2, 2014, Contempt Defendants blast-faxed "proposals" to as many as 149,000 small businesses and other organizations across the country.[11] CPU's fax is strikingly similar in structure and appearance to the fax YYB defendants used to deceive consumers. Both the YYB and the CPU faxes provide a "Total Amount" due and list a dollar amount. Both request payment by check or credit card and provide mailing instructions and a standard credit card payment form. Both include a date and a unique

---

[9]  Ex. 4, McPeek Decl. at 2, ¶ 5, Att. 2 (website through June 8, 2015) & Att. 3 (website on August 24, 2015).

[10]  Doc. No. 71, Final Order, at 3-4.

[11]  Ex. 4, McPeek Decl. at 2-3, ¶ 9, Att. 6 (CPU fax to Alden Pines Country Club dated October 11, 2014). Ex. 4, McPeek Decl. at 3, ¶ 12 (CPU's contact list of business contains 149,792 company names).

invoice number. Both list a fax number and email address, but provide no phone number to call with questions or to leave a message. Both employ recognizable corporate symbols and logos, YYB used the well-known Yellow Page directories' "walking fingers," while CPU uses corporate logos, including Microsoft, HP, and Epson.[12]

According to records produced by Contempt Defendants, as of June 2015, CPU had obtained over $236,000 form 645 organizations in response to the company's fax since the entrance of the Final Order.[13] Money paid to Contempt Defendants was initially deposited in a CPU corporate bank account in Oklahoma City. Thereafter, Law withdrew most of the money in cash.[14]

The FTC obtained declarations from 12 organizations that paid money to CPU.[15] All of the organizations believed that the fax from CPU was an invoice or bill for money due.[16] Some of the declarants were deceived by the structure and general appearance of the

---

[12] Compare fax used by YYB, Ex. 5 [Doc. No. 4, Plaintiff's Ex. 15, Welsh Decl., App. 236] to fax used by CPU, Ex. 4, McPeek Decl. at 2-3, ¶ 9, Att. 5 (CPU invoice-like fax).

[13] Ex. 4, McPeek Decl. at  4, ¶ 13. These figures do not include money deceptively obtained by CPU in violation of the Preliminary Injunction before the Final Order was entered on December 2, 2014.

[14] Ex. 4, McPeek Decl. at 5-6, ¶ 21. From December 2014 through May 2015, approximately $213,000 was deposited into CPU accounts.  During that time, Contempt Defendant Law made cash withdrawals totaling more than $137,000. On 148 occasions Law made ATM withdrawals of $500 each and on five occasions he withdrew amounts between $9,000 and $9,800. Law never made a withdrawal in excess of $10,000. *Id.*

[15] *See* Ex. 6 through 17, Consumer Declarations.

[16] *See, e.g.*, Ex. 7, Wine Decl., ¶ 3; Ex. 8, Kocian Decl., ¶ 3; Ex. 10, Newcomer Decl., ¶ 5; Ex. 16, Fatutta Decl., ¶ 5.

fax.[17] Others cited CPU's request for payment of a specified amount as the reason they believed the fax was a bill.[18] None of the organizations received any services from CPU.[19] In fact, after obtaining money from organizations, CPU often had no further contact with them, thus failing to provide them the URL for CPU's website where services purportedly could be obtained and failing to notify of them of any password needed to access the site.[20]

The CPU fax contains a disclosure buried in the fine print at the bottom of the one-page fax as follows:

> DISCLAMER: All logos contained herein are the property of their respective owners. This is a proposal for the order of goods or services, or both, and this is not a bill, invoice, or statement of account due. You are under no obligation to make any payments on account of this offer unless you accept this offer. Your organization and our company have in the past not done business together.[21]

However, for the originations that paid CPU, this language did not overcome the overall impression that the fax was an invoice for money due.[22] In fact, a number of the declarants stated that they did not even see the disclosure at the bottom of the page.[23]

---

[17]  *See, e.g.*, Ex. 11, Merriam Decl., ¶ 4; Ex. 6, Brooks Decl., ¶ 5; Ex. 7, Wine Decl., ¶ 5; Ex. 8, Kocian Decl., ¶ 3; Ex. 16, Fatutta Decl., ¶ 5; Ex. 9, Hedger Decl., ¶ 4.

[18]  *See, e.g.*, Ex. 12, Plemmons Decl., ¶ 4; Ex. 13, Clark Decl., ¶ 4.

[19]  *See, e.g.*, Ex. 14, Ellenwood Decl., ¶ 7; Ex. 12, Plemmons Decl., ¶ 7; Ex.10, Newcomer Decl., ¶ 5.

[20]  *See, e.g.*, Ex. 9, Hedger Decl., ¶ 9; Ex. 12, Plemmons Decl., ¶ 7; Ex. 15, Simpson Decl., ¶ 7; Ex. 16, Fatutta Decl., ¶ 8.

[21]  Ex. 4, McPeek Decl. at 2-3, ¶ 9, Att. 5 (CPU invoice-like fax).

[22]  *See, e.g.*, Ex. 7, Wine Decl., ¶ 7.

**2 .    Using Consumer Information in Violation of the Final Order**

Section VIII.B. of the Final Order permanently restrains and enjoins all those bound

by the order from directly or indirectly "using or benefitting from consumer information,

including the name, address, telephone number, email address, Social Security Number,

other identifying information . . . that any Defendant obtained prior to entry of this Order

in connection with the sale of Internet business-directory listings."[24]

There is strong evidence indicating that Contempt Defendants are using the same

database of target companies compiled in connection with the YYB scam to purvey their

current scam. On February 26, 2015, the FTC's requested that Contempt Defendants

provide contact information for all businesses to which CPU faxed a solicitation.[25] In their

March 20, 2015, response Contempt Defendants produced a database containing contact

information for just over 149,000 businesses.[26] The metadata contained in the database

revealed that it was created on February 22, 2011, just prior to the incorporation of YYB

on April 14, 2011.[27]

---

[23]  *See, e.g.*, Ex. 6, Brooks Decl., ¶ 9.

[24]  Doc. No. 71, Final Order, at 10-11.

[25]  Ex. 4, McPeek Decl. at 2, ¶ 8, Att. 4 (FTC's Second Request).

[26]  Ex. 4, McPeek Decl. at 3, ¶¶ 10, 12.  Although Contempt Defendants did not specify which FTC question the database was responsive to, it is reasonable to infer that it was in response to the request for a list of businesses to which CPU faxed a solicitation.

[27]  Ex. 4, McPeek Decl. at 3, ¶ 12, Att. 8 (file date February 22, 2011); Ex. 18, YYB Corporation Filing [Doc. No. 4, Plaintiff's Ex. 2, App. 16] (YYB Incorporation on April 14, 2011).

## III.   ARGUMENT

Clear and convincing evidence establishes that Contempt Defendants are bound by, and have notice of, the Final Order and that they failed to comply with its provisions. Contempt Defendants should be required to compensate consumers harmed by their contumacious conduct and coercive sanctions should be imposed to compel restitution and compliance with the Final Order.

### A.   Legal Standard for Civil Contempt

A district court has broad discretion in using its contempt powers to require adherence to court orders. *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1209 (10th Cir. 1992) (quoting *United States v. Riewe*, 676 F.2d 418, 421(10th Cir. 1982)). As a party to the original action, the FTC may invoke the Court's order enforcement power by initiating a proceeding for civil contempt in the same action. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444-45 (1911). A person who is in "active concert or participation" with anyone bound by the order and who receives "actual notice of [the order] by personal service or otherwise" is bound by the order. FED. R. CIV. P. 65(d)(2). To establish that Contempt Defendants are in contempt, the FTC must prove by clear and convincing evidence that: (1) a valid court order existed; (2) Contempt Defendants had knowledge of the order; and (3) Contempt Defendants disobeyed the order. *F.T.C. v. Kuykendall*, 371 F.3d 745, 756-57 (10th Cir. 2004) (quoting *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998)). Where contempt results in injury to a party, that party may be entitled to compensation. *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1318 (10th Cir. 1998) (quoting *O'Connor v. Midwest Pipe*

9

*Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992)). Once contempt has been

established by clear and convincing evidence, proof of resulting damages need only be

established by a preponderance of the evidence. *Kuykendall*, 371 F.3d at 754.

### B.    All Elements of Contempt are Met

### 1.    The Final Order is Valid

This Court's Final Order, a stipulated consent, is valid and enforceable. *United

States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971); *Whitfield v. Pennington*, 832 F.2d

909, 913 (5th Cir. 1987) ("A consent order, while founded on the agreement of the parties,

is nevertheless a judicial act, enforceable by sanctions including a citation for contempt.").

The order meets the Rule 65(d), Fed. R. Civ. P. standard that injunctions describe in

reasonable detail the acts sought to be restrained. *See Pasadena City Bd. of Ed. v.

Spangler*, 427 U.S. 424, 438-39 (1976). The permanent injunction, to which Law agreed,

informed him with particularity that he is permanently restrained and enjoined from

"misrepresenting, or assisting others in misrepresenting, expressly or by implication . . .

that consumers owe money for a good or service." and from "using or benefitting from

consumer information . . . that any Defendant obtained prior to entry of this Order in

connection with the sale of Internet business-directory listings."

### 2.    Contempt Defendants have Knowledge of the Final Order

Contempt Defendants have actual notice of, and are bound by, the Final Order. Law

has notice because he was a party to the stipulated Final Order and signed a written

acknowledgement that he received a copy of the order. *See SEC v. Current Fin. Servs.,

Inc.,* 798 F. Supp. 802, 806 n. 11 (D.D.C. 1992) (parties to the action have notice of the

court's orders). The Final Order binds not only Law but also those "who receive actual notice of" the Final Order and "who are in active concert or participation" with him. *See* FED. R. CIV. P. 65(d)(2). Contempt Defendant CPU has notice of the Final Order through Law, who owns and controls the company. *See Cablevision Sys. Corp. v. Muneyyirci*, No. CV 90 2997 (RJD), 1995 WL 362541 at *3, n1 (E.D.N.Y. June 2, 1995) (holding that firm "had actual notice [of injunction] . . . by virtue of the fact that people controlling the corporation had actual knowledge of those orders"). There is no question that CPU is acting in concert or participation with Law with respect to the conduct that violates the Final Order, since Law runs the company.

### 3.     Contempt Defendants Disobeyed the Final Order

As discussed in Part II.C. above, Contempt Defendants have repeatedly and egregiously violated two provisions of the Final Order by: (1) sending invoice-like faxes that misrepresent, expressly or by implication, that consumers owe money for a good or service, in violation of Section II.C.; and (2) using or benefitting from consumer information obtained in connection with YYB, in violation of Section VIII.B. Contempt Defendants will argue that they did not intend to deceive consumers as evidenced by their inclusion of certain disclosures at the bottom of the CPU fax. However, intent is not an element of civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *In re General Motors*, 61 F.3d 256, 258 (4th Cir. 1995) ("Willfulness is not an element of civil contempt."). The court need only find that defendant has not been "reasonably diligent and energetic in attempting to accomplish what was ordered." *Goluba v. School*

*Dist. of Ripon*, 45 F.2d 1035, 1037 (7th Cir. 1995) (quoting *Stotler and Co. v. Able*, 870

F.2d 1158, 1163 (7th Cir. 1989)).

   In addition, Contempt Defendants' disclosures do not magically cure the net

impression of their fax, which consumers reasonably believe to be an invoice or bill for

money due. *See, e.g., In re Giant Foods*, 61 F.T.C. 326, 1962 WL 75443, at *19 (July 31,

1962) (small print disclaimers that were inconsistent with and contradictory to the content

of the advertisements were ineffective to cure deceptive advertising), *aff'd Giant Food,*

*Inc. v. FTC,* 322 F.2d 977, 986 (D.C. Cir. 1963). A disclaimer does not automatically

exonerate deceptive activities. *In re Rexplore Securities Litigation*, 671 F. Supp. 679, 683-

85 (N.D. Cal. 1987). *See also, FTC v. Gill,* 71 F.Supp.2d 1030*,* 1043, quoting *FTC v. U.S.*

*Sales Corp*., 785 F.Supp. 737, 745 (N.D. Ill. 1992), *aff'd,*1995 U.S. App. LEXIS 6092 (7th

Cir. 1995) ("[T]he Court looks at the 'overall net impression made by the advertisement in

determining what message may be reasonably ascribed to it.'"). The standard is whether

statements would mislead an ordinary consumer, which the Court evaluates based on the

net impression the statements create, even if they are made in conjunction with truthful

disclosures. *FTC v. Affiliate Strategies*, *Inc.,* 849 F. Supp. 2d 1085, 1106 (D. Kan. 2011).

   This Court's Final Order does not carve-out a safe harbor for documents that

contain affirmative disclosures. Moreover, as described in numerous consumer

declarations, businesses were deceived by Contempt Defendants' fax. It is inescapable

these businesses would not have paid CPU for otherwise unordered, unwanted,

undelivered (and likely nonexistent) services unless Contempt Defendants' fax left them

with the deceptive overall impression that they owe money to the company. Thus, the

faxes sent by Contempt Defendants misrepresent, expressly or by implication, that consumers owe money for a good or service and violate the Final Order.[28]

## C.    Proposed Remedy

Contempt Defendants should face both compensatory and coercive sanctions as a result of their contemptuous conduct. A court may impose civil sanctions to compensate parties for harm suffered due to defendant's non-compliance and to coerce compliance with the order. *United States v. United Mine Workers of America*, 330 U.S. 258, 303-4 (1947). Here, both types of contempt sanctions are necessary and appropriate.

### 1.    Compensatory Monetary Relief Should Be Ordered

Contempt Defendants should be ordered to pay compensatory monetary relief to the victims of their contempt for harm caused by their contumacious acts.  *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) ("The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."). When the FTC has shown through clear and convincing evidence that defendants were engaged in a pattern or practice of contemptuous conduct, the district court may use the defendants' gross receipts as a starting point for assessing sanctions. *Kuykendall*, 371 F.3d at 764. Accordingly, the full amount consumers paid for Contempt Defendants' unordered, unwanted, undelivered services is the correct measure of compensatory sanctions.

---

[28]  The faxes sent by Contempt Defendants after December 2, 2014 violate Section II.C. of the Final Order. The faxes sent by Contempt Defendant Law prior to December 2, 2014 violate an identical prohibition contained in Section I.C. of the Preliminary Injunction.

## 2.     Strong Coercive Sanctions are Necessary to Ensure Compliance

Because of the repetitive and ongoing nature of Law's conduct and the likelihood that he has hidden the money obtained from his scam, the FTC seeks the imposition of coercive sanctions to ensure that Contempt Defendants cease sending faxes that misrepresent consumers owe money for a good or service and pay compensatory monetary relief to the victims of their contempt. The two paradigmatic coercive civil contempt sanctions are imprisonment or a per diem fine for each day the contemnor fails to comply with a court order. *United Mine Workers v. Bagwell*, 512 U.S. 821, 828-29 (1994). Coercive incarceration is permissible in a civil contempt order when the court determines that there is a "realistic possibility that the contemnor will [comply]" with an affirmative order to pay. *CFTC v Wilmington Precious Metals, Inc.*, 950 F.2d 1525, 1530-31, (*citing In re Grand Jury Proceedings (Howald)*, 877 F.2d 849, 850 (11th Cir.1989)); see also *Simkin v. United States*, 715 F.2d 34, 37 (2d Cir.1983) ("As long as the judge is satisfied that the coercive sanction might yet produce its intended result, the confinement may continue. But if the judge is persuaded ... that the contempt power has ceased to have a coercive effect, the civil contempt remedy should be ended."). The burden is on the contemnor to prove that "no such realistic possibility exists," *Simkin*, 715 F.2d at 37.

In this case, imprisonment is appropriate. There is a realistic possibility that Contempt Defendants can comply with an order to pay compensatory monetary relief to the victims of their contempt. In total, Law has withdrawn more than $137,000 in cash. He thus has access to funds to return to his victims. Therefore, the Court should order that Law affirmatively pay the full amount of compensatory remedial relief within ten (10)

days. If Law fails to do so, he should be incarcerated until such time as he pays the full amount of any compensatory remedy ordered by the Court, including providing refunds to those deceived by his contemptuous acts. Law should remain incarcerated until he pays the full amount or proves that he has taken all reasonable efforts to do so.

## IV.    CONCLUSION

The clear and convincing evidence set forth above establishes a *prima facie* case of contempt, shifting the burden to Contempt Defendants to demonstrate that they have not violated the Final Order. *Chicago Truck Drivers Union Pension Fund v. Brotherhood Lab. Leasing,* 207 F.3d 500, 505 (8th Cir. 2000). The FTC respectfully requests that the Court grant its motion, enter the proposed Order to Show Cause, and set a hearing for this matter.

Dated: August 27, 2015                        Respectfully,

                                         /s/ *Thomas B. Carter*
                                        THOMAS B. CARTER
                                        Texas Bar No. 03932300
                                        REID TEPFER
                                          Texas Bar No. 24079444

                                        Federal Trade Commission
                                        1999 Bryan Street, Suite 2150
                                        Dallas, Texas 75201
                                        (214) 979-9372; tcarter@ftc.gov
                                        (214) 979-9395; rtepfer@ftc.gov
                                        (214) 953-3079 (fax)
                                        Attorneys for Plaintiff
                                        FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I certify that Plaintiff Federal Trade Commission served the foregoing on John H. Graves, at the Law Office of John H. Graves, PLLC, 12216 South Western, Oklahoma City, Oklahoma 73170, attorney for Contempt Defendants Robert Ray Law and CPU Service Incorporated.

Dated: August 27, 2015                              /s/ *Thomas B. Carter*
                                                    Thomas B. Carter